# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

HYRUM JOSEPH WEST,

    Plaintiff,

v.

BRIAN WILLIAMS, *et al.*,

    Defendants.

Case No. 2:15-cv-1504-LDG (NJK)

<u>ORDER</u>

Presently before the Court is a habeas corpus proceeding under 28 U.S.C. §2254 brought by Hyrum Joseph West, a Nevada State prisoner.

<u>Procedural Background</u>[1]

As previously summarized by the Court, in June 2011, a jury found West guilty of trafficking a Schedule 1 controlled substance following a trial in Nevada's Fifth Judicial District Court. Prior to sentencing, West filed a motion for mistrial. At West's sentencing hearing, the court denied the motion and sentenced West to a prison term of 10 to 25 years. West then filed a motion for a new trial.

---

[1] The Court has compiled the procedural history from the exhibits filed at ECF Nos. 17-22 and this Court's own docket.

The state district court entered a judgment of conviction on December 30, 2011, and an order denying the motion for new trial on March 20, 2012. West appealed. The Nevada Supreme Court remanded the matter for a written disposition of the court's order denying West's pretrial motions to dismiss and to suppress.

On December 13, 2012, the Nevada Supreme Court affirmed West's conviction. West filed a separate appeal of the state district court's written order denying his motion to dismiss and motion to suppress. On January 24, 2013, the Nevada Supreme Court dismissed the appeal for lack of jurisdiction.

On November 12, 2013, West filed a proper person state habeas petition and supporting memorandum. He filed a counseled supplemental petition on June 25, 2014. On October 21, 2014, the state court entered an order denying some of West's claims on the merits and finding his remaining claims procedurally barred pursuant to Nev. Rev. Stat. §34.810. West appealed.

On April 15, 2015, the Nevada Court of Appeals affirmed the denial of most of West's claims on the merits, but dismissed one ground as procedurally barred pursuant to Nev. Rev. Stat. 34.810, and declined to address additional claims on the ground that West failed to support them with any cogent arguments.

On May 7, 2015, before remittitur issued on the appeal, West filed a petition for writ of mandamus with the Nevada Supreme Court in which he sought an evidentiary hearing on his state habeas petition. The Nevada Supreme Court declined to exercise its original jurisdiction and denied mandamus. The court also denied West's petition for rehearing.

Prior to the conclusion of his state proceedings, on or about July 31, 2015, West initiated his federal habeas petition, in which he raised six grounds along with a lengthy supporting memorandum and exhibits, by mailing or handing the petition to a correctional officer for the purpose of mailing the petition to this Court. Respondents moved to dismiss

the petition, arguing that the claims were unexhausted, procedurally barred or not cognizable.

On September 28, 2016, this Court granted the motion to dismiss, but also granted West leave to amend his petition to address several deficiencies in the initial petition. On November 1, 2016, West filed an amended federal petition (CM/ECF No. 33) and a memorandum in support (CM/ECF No. 34). Respondents again moved to dismiss the amended petition, again arguing that West's claims were unexhausted, procedurally barred or not cognizable. This Court granted the motion in part, determining that West had included many unexhausted claims in the amended federal habeas petition, and that to the extent that West had exhausted Grounds 1, 2, 3, and 4 of his amended petition, those grounds for relief were not cognizable under *Stone v. Powell*, 428 U.S. 465 (1975).[2]

As West had included unexhausted claims in his amended federal petition, thus presenting the Court with a mixed petition, the Court provided West the opportunity to either (1) abandon his unexhausted claims and proceed on the remaining claims, or (2) request that the proceedings be stayed and held in abeyance while he exhausted his state court remedies as to the unexhausted claims. The Court notified West that the latter option required that such a request be filed as a motion and that he make the necessary showing to stay a mixed petition under *Rhines v. Weber*, 544 U.S. 269 (2005).

West moved for a stay and abeyance of his amended federal petition. The Court denied that motion, finding that West had not met his burden of demonstrating good cause for his failure to exhaust his unexhausted claims, as required under *Rhines*. The Court provided West an opportunity to abandon his unexhausted claims and proceed with his exhausted claims. The Court notified West that, if he failed to do so, the Court would be

---

[2] The Court further noted that, to the extent West was alleging a Fourth Amendment violation in Grounds 5, 7, and 12, any such Fourth Amendment claims raised in those grounds for relief were also barred by *Stone v. Powell*.

3

required to dismiss the entire petition under *Rose v. Lundy*, 455 U.S. 509 (1982) as a mixed petition. After West filed an abandonment of his unexhausted claims, respondents filed an answer (CM/ECF No. 70) to the remaining exhausted claims. West has filed a response (CM/ECF No. 72) to that answer.

Factual Background.

The state presented the following evidence at trial. Sometime prior to the early morning hours of July 10, 2010, Detective Meade, who worked in the Nye County Sheriff's Office's narcotics unit, developed West as a target involved in the trafficking of methamphetamine. After receiving a call from a Las Vegas Metropolitan police officer, Detective Meade went to the highway from Las Vegas to Pahrump "in anticipation of Hyrum West returning back to Pahrump from Las Vegas," along with another detective and a couple of patrol officers.

One of the patrol officers, Deputy Otteson, spotted West's vehicle. Using a radar unit, she established that the vehicle was traveling 59 m.p.h. in a 55 m.p.h. zone. Deputy Otteson conveyed this information to the other law enforcement officers by radio. Based on that information, Deputy Zaragoza conducted a traffic stop of the vehicle West was driving.

After arriving at the location where West was stopped, Deputy Otteson asked West whether he consented to a search of the vehicle, to which he said, "Yes." Deputy Hunt, a canine deputy, did an external search of the vehicle with his canine partner, Indy. Indy alerted to the odor of a controlled substance on the driver's side door of the vehicle and on a clear package containing currency. Detective Meade then conducted a search of the vehicle, finding two blue pouches that contained a substance he suspected was methamphetamine. The blue pouches were hidden in the gear shift box. Subsequent testing confirmed that the substance was slightly more than 215 grams of methamphetamine. Several days later, Detective Meade interviewed West. West

4

specifically discussed the quantity and quality of the methamphetamine that Detective Meade had seized from West's car.

Analysis

This matter is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). Under the AEDPA, federal courts cannot grant habeas relief when a state court has adjudicated a claim on its merits unless the state court adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). To obtain relief, a petitioner must do more than show that "the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams v. Taylor*, 529 U.S. 362, 411 (2000). Instead, a petitioner must show that the state court's rejection of the claim was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103(2011). In making this determination, the state courts' factual findings are entitled to the presumption of correctness. 28 U.S.C. § 2254(e)(1).

Ground Six.

West asserts his stop was recorded by the camera and video recording system in Deputy Zaragoza's patrol car. This video recording would have both shown that he was still in a 65 m.p.h. zone when Deputy Zaragoza initiated the traffic stop for speeding in a 55 m.p.h. zone, and that he did not consent to a search of his vehicle in response to Deputy Otteson. He argues that the State violated *Brady v. Maryland*, 373 U.S. 83, 87 (1963), by failing to disclose the video recording. He contends that, because he is alleging a *Brady* violation, he does not have to show that the State acted in bad faith because such a

"violation occurs when the government fails to disclose evidence materially favorable to the accused." *Youngblood v. West Virginia*, 547 U.S. 867, 869 (2006).

The Court previously determined that West exhausted his claim that the State suppressed or destroyed material exculpatory evidence in violation of his constitutional rights.[3] The specific evidence he claims was destroyed or suppressed was the video recording of the traffic stop and arrest, as recorded by the dashcam video recorder installed in Deputy Zaragoza's patrol car.

During the preliminary hearing, Deputy Zaragoza testified that his patrol vehicle had video recording equipment and that he believed the equipment was operational. In response to defense counsel's questions, Deputy Zaragoza indicated he did not have a videotape of the stop because he "didn't think to put it in evidence." When questioned whether the video recording existed, Deputy Zaragoza indicated he would need "to look through the videotapes, sir."

West later learned that the recording of the stop on the video tape in Deputy Zaragoza's patrol car had apparently been recorded over. In response, he moved to dismiss the case based upon the destruction of, or failure to preserve, evidence. During the resulting evidentiary hearing, Deputy Zaragoza testified that the videotape containing the recording of the stop had still been in his patrol car. When he attempted to review the recording of the stop on that tape, he discovered that "the dates were not concurrent with the video. It would have one date here, and it would skip and have a different date." He further testified the only time he had touched the video tape was when he received it as a blank tape and had placed it in the video equipment in the car. He testified, based on his notation on the tape, that he had placed the tape into the equipment on January 22, 2010, and that he had never replaced that tape. He indicated that the equipment should have

---

[3] West asserts the destruction of the video recording was intentional "or, at the very least, inadvertently allowed to be destroyed."

6

notified him when the tape was full. The state also provided testimony indicating that the equipment, if it had functioned as intended, would have only recorded on blank tape and would not have recorded over previously-recorded tape. A portion of the tape was played, which showed a video recording made August 2, 2010, then a jump to a video recording made on July 10, 2010, of the stop of West's vehicle. This recording was extremely short, and then the recording on the videotape again jumped to a different date. The state proffered that the remainder of the tape was consistent, with recordings constantly jumping between different dates until the tape was removed from the vehicle in October 2010.

      The trial court denied West's motion to dismiss based upon the destruction or failure to preserve evidence, which motion argued, in part, that failure to preserve the video recording violated *Brady*. The trial court found that Deputy Zaragoza's video recording system was malfunctioning at the time of the stop, that the videotape record of the traffic stop in question and other traffic stops was in disarray and unintelligible, and that Deputy Zaragoza did not purposely destroy the videotape evidence of West's stop. The trial court concluded that there was no evidence that the videotape evidence of the traffic stop was destroyed in bad faith.

      West appealed the trial court's denial of his motion to dismiss. The Nevada Supreme Court reviewed the trial court's decision for abuse of discretion and affirmed. It noted that the "failure to preserve potentially exculpatory evidence may result in dismissal of charges if the defendant can show bad faith or connivance on the part of the government or that he was prejudiced by the loss of the evidence." The Nevada Supreme Court concluded that "the record on appeal supports the district court's factual findings" and that "West has failed to demonstrate that the State acted in bad faith or that he was prejudiced by the loss of the videotape." Accordingly, the Nevada Supreme Court determined that the trial court had not abused its discretion in denying West's motion to dismiss.

West's argument rests on the premise that the Nevada Supreme Court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" because it did not apply *Brady* in reviewing his appeal. The Supreme Court held in *Brady* that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. As such, he argues the Nevada Supreme Court erred by applying a bad faith requirement. West's argument ignores, however, that the Supreme Court has recognized that a different standard applies to a State's failure to preserve potentially useful evidence, rather than the suppression of favorable evidence. As stated by the Supreme Court, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)." Given that the Nevada Supreme Court reviewed West's appeal for "failure to preserve potentially exculpatory evidence," West must first establish that the underlying factual determination that the video recording was "potentially exculpatory evidence" was unreasonable in light of the evidence presented in the evidentiary hearing. He has not. West has also failed to show that the Nevada Supreme Court's decision that he had not shown the State acted in bad faith or that he was prejudiced by the loss of the video recording was contrary to, or involved an unreasonable application of, *Youngblood*. Accordingly, West is not entitled to relief on his sixth ground for relief.

Ground Seven.

The exhausted claim alleged by West in Ground Seven is that his rights under the Confrontation Clause were violated by the presentation of hearsay evidence. As recited in his state post-conviction petition, the exhausted portion of Ground Seven rests on his assertion that "Detective Meade informed the jury he had received information from the Las

8

Vegas Metropolitan Police Department that a tipster had implicated Mr. West." He further asserted that "the prosecutor and the lead detective provided compelling and highly prejudicial hearsay information against Mr. West." He subsequently alleged that "the prosecutor and the lead detective provided the jury with blatant hearsay." He asserts he "was not given an opportunity to confront the individual who allegedly 'tipped off' the metropolitan police department. Moreover, the anonymous silent witness allegedly provided information that was particularly devastating to Mr. West." Absent from West's state post-conviction petition, however, is any citation to the specific testimony of Detective Meade underlying this ground for relief, or to any specific statement made my the prosecutor to the jury.

To the extent West elaborates on the facts alleged in his state post-conviction petition in his present petition, he asserts that "during the trial the lead det [sic] Meade and dda [sic] White provided compelling and high prejudicial hearsay information against West from that CI Williams." He further asserts the "prosecutor highlighted the anonymous tipster in his closing argument."

The Court has reviewed the entirety of Detective Meade's testimony, and cannot identify any testimony by Detective Meade that "he had received information from the Las Vegas Metropolitan Police Department that a tipster had implicated Mr. West." In his closing arguments, the prosecutor stated "Detective Meade told you that he got tipped off that Mr. West was coming back in." The "tip off" Detective Meade received, and to which the prosecutor was apparently referring, however, did not concern information from an informant implicating West. Rather, Detective Meade testified that he had communicated with the Las Vegas Metropolitan Police Department as a result of his efforts to develop West as a target "as somebody that may be involved in methamphetamine." Detective Meade testified he had received a call from Carl Bomer, of the Las Vegas Metropolitan Police Department, and that as a result of this call, he contacted other police officers and

9

went to Highway 160 "in anticipation of Hyrum West returning back in to Pahrump from Las Vegas." Detective Meade further testifed that he had reason to believe West was coming back to Pahrump based on his conversation with Bomer.

    West is not entitled to any relief on this seventh ground because the testimony of Detective Meade and the statement of the prosecutor, as recorded in the transcript of the trial, are contrary to his allegations. Detective Meade testified that he acted based upon a call he received from Bomer. Detective Meade's testimony of his actions based upon a call that he received, which did not disclose the statement made by Bomer, was not hearsay evidence. (Further, contrary to West's allegations, this phone call did not come from an informant implicating West, but from a police officer.) In addition, the prosecutor did not make a statement, during his closing argument, concerning a tip from an informant implicating West. Rather, he stated that Detective Meade acted on a tip that West was returning to Pahrump. The statement reflected Detective Meade's testimony on cross-examination, when West elicited testimony that Bomer had said he (Bomer) had observed West's vehicle driving toward Pahrump. Again, Detective Meade's testimony was not hearsay. As with the Detective Meade's earlier testimony regarding the call, this evidence of Bomer's statements did not go to the truth of the matter asserted (that Bomer had observed West's vehicle driving toward Pahrump) but to explain why Detective Meade called other officers and then went to Highway 160. Accordingly, West is not entitled to relief on the exhausted claim in his seventh ground for relief.

    Ground Eight

    The exhausted claim alleged by West in Ground Eight is that, as he did not consent to the declared mistrial in his first trial, his second trial violated the Double Jeopardy Clause. West argues that, as he did not consent to the mistrial, the judge presiding at his first trial could declare a mistrial only if there was a "manifest neccissity" for doing so. Relying largely on Ninth Circuit and Nevada Supreme Court decisions, he argues there was

10

not such a "manifest neccesity," and therefore the judge abused his discretion in declaring a mistrial. In light of West's arguments, the Court begins by noting that the Supreme Court has indicated the proper framing for such claims:

> It is important at the outset to define the question before us. That question is not whether the trial judge should have declared a mistrial. It is not even whether it was an abuse of discretion for her to have done so—the applicable standard on direct review. The question under AEDPA is instead whether the determination of the Michigan Supreme Court that there was no abuse of discretion was "an unreasonable application of ... clearly established Federal law." § 2254(d)(1).

*Renico v. Lett*, 559 U.S. 766, 772–73 (2010).

At the outset, the Court recognizes that the "clearly established Federal law" governing this §2254 petition is the "clearly established Federal law, as determined by the Supreme Court." The Supreme Court provided a thorough summary of the relevant, "clearly established Federal law" governing a trial judge's declaration of a mistrial on the grounds that the jury is deadlocked.

> The "clearly established Federal law" in this area is largely undisputed. In *Perez*, we held that when a judge discharges a jury on the grounds that the jury cannot reach a verdict, the Double Jeopardy Clause does not bar a new trial for the defendant before a new jury. We explained that trial judges may declare a mistrial "whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for doing so." The decision to declare a mistrial is left to the "sound discretion" of the judge, but "the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes."
>
> Since Perez, we have clarified that the "manifest necessity" standard "cannot be interpreted literally," and that a mistrial is appropriate when there is a "'high degree'" of necessity. The decision whether to grant a mistrial is reserved to the "broad discretion" of the trial judge, a point that "has been consistently reiterated in decisions of this Court."
>
> In particular, "[t]he trial judge's decision to declare a mistrial when he considers the jury deadlocked is ... accorded great deference by a reviewing court." A "mistrial premised upon the trial judge's belief that the jury is unable to reach a verdict [has been] long considered the classic basis for a proper mistrial."
>
> The reasons for "allowing the trial judge to exercise broad discretion" are "especially compelling" in cases involving a potentially deadlocked jury. There, the justification for deference is that "the trial court is in the best

11

position to assess all the factors which must be considered in making a necessarily discretionary determination whether the jury will be able to reach a just verdict if it continues to deliberate." In the absence of such deference, trial judges might otherwise "employ coercive means to break the apparent deadlock," thereby creating a "significant risk that a verdict may result from pressures inherent in the situation rather than the considered judgment of all the jurors."

This is not to say that we grant absolute deference to trial judges in this context. *Perez* itself noted that the judge's exercise of discretion must be "sound," and we have made clear that "[i]f the record reveals that the trial judge has failed to exercise the 'sound discretion' entrusted to him, the reason for such deference by an appellate court disappears." Thus "if the trial judge acts for reasons completely unrelated to the trial problem which purports to be the basis for the mistrial ruling, close appellate scrutiny is appropriate." Similarly, "if a trial judge acts irrationally or irresponsibly, ... his action cannot be condoned."

We have expressly declined to require the "mechanical application" of any "rigid formula" when trial judges decide whether jury deadlock warrants a mistrial. We have also explicitly held that a trial judge declaring a mistrial is not required to make explicit findings of " 'manifest necessity' " nor to "articulate on the record all the factors which informed the deliberate exercise of his discretion." And we have never required a trial judge, before declaring a mistrial based on jury deadlock, to force the jury to deliberate for a minimum period of time, to question the jurors individually, to consult with (or obtain the consent of) either the prosecutor or defense counsel, to issue a supplemental jury instruction, or to consider any other means of breaking the impasse.

*Lett*, 559 U.S. at 773–75.

The Nevada Supreme Court's decision, while terse, establishes that it did not unreasonably apply the law as established by the Supreme Court. That court noted that trial judge determined "the jury foreman stated that the last poll was eight-four, the jury was hopelessly deadlocked, and further deliberation would not be helpful." It further noted that "a deadlocked jury is the classic example of the 'manifest necissity' for mistrial." The Nevada Supreme Court's determination was not objectively unreasonable. Accordingly, West is not entitled to relief on the exhausted Double Jeopary Clause claim in his eighth ground for relief.

12

Ground Nine

West's exhausted claim, in his ninth ground for relief, is that his appellate counsel was ineffective for failing to assert, as an issue in his direct appeal, that the judge presiding at the second trial violated the "law of the case" by refusing to read two of West's jury instructions that were given to the jury in his first trial.

A criminal defendant is entitled to reasonably effective assistance of counsel. *McMann v. Richardson*, 377 U.S. 759, 771, n. 14 (1970). The right to effective assistance of counsel is the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. *Strickland v. Washington*, 466 U.S. 668, 685 (1984). When a true adversarial criminal trial has been conducted, even if defense counsel has made demonstrable errors, the requirements of the sixth amendment have been met. *United States v. Cronic*, 466 U.S. 648, 656 (1984). Counsel is presumed competent. As such, the burden rests on the defendant to establish a constitutional violation. *Cronic* at 658.

To obtain reversal of a conviction, petitioner must prove (1) that counsel's performance was so deficient that it fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defense to such a degree as to deprive the defendant of a fair trial. *Strickland*, 466 U.S. at 687-88, 692 (1984). To establish deficient performance under *Strickland*, it must be shown "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. *Id*. at 687. Exercising highly deferential judicial scrutiny, *Id*. at 699, this court inquires "whether counsel's assistance was reasonable considering all the circumstances." *Id*. at 688. "Such assessment must be made 'from counsel's perspective at the time,' so as 'to eliminate the distorting effects of hindsight.'" *Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir. 2002) (citing *Strickland*, 466 U.S. at 689). Prejudice can be presumed only "where there has been an actual breakdown in the

adversarial process at trial." *Toomey v. Bunnell*, 898 F.2d 741, 744 n. 2 (9th Cir.), *cert. denied*, 111 S.Ct. 390 (1990); *See also Cronic, supra*.

Appellate counsel does not have a constitutional obligation to raise every nonfrivolous issue requested by the appellant. *Jones v. Barnes*, 463 U.S. 745, 751 (1983). "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Id.* at 751-52.

The underlying premise of West's ninth ground for relief is that the second trial court was bound by the "law of the case" to give the same jury instructions as given in the first trial. West's concept of "the law of the case" is contrary to Nevada law. In Nevada, the "law of the case" requires only that lower courts follow appellate court rulings in the same case. *Hsu v. Cty. of Clark*, 173 P.3d 724, 728 (Nev. 2007). West's appellate counsel was not ineffective for failing to assert, in the direct appeal, that the second trial judge violated the law of the case by not following a ruling of the first trial judge.

Ground Ten

In his tenth ground for relief, West argues his appellate counsel was ineffective for failing to challenge the reasonable doubt instruction given to the jury. Courts have, however, consistently and repeatedly held that the instruction given by trial judge appropriately describes the state's burden of proof regarding reasonable doubt. Accordingly, counsel was not ineffective for failing to raise this issue on direct appeal.

Ground Eleven

In his eleventh ground for relief, West alleges he was deprived of the assistance of counsel. In sparse and vague allegations, he argues his counsel suggested or instructed West to represent himself, such advice resulting from counsel's effort to avoid sanctions threatened by the prosecution. The threatened sanctions, West suggests, created an actual conflict of interest in counsel, forcing West to represent himself. West does not

challenge the trial court's canvas, in which the court determined West's election to represent himself was knowing and voluntary. The Nevada Court of Appeals denied West relief on this issue, finding that "West failed to support this claim with sufficient facts that, if true, entitled him to relief." Accordingly, to obtain relief, West must show was that this decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." He has not done so, and could not do so because the record is contrary to his vague allegations.

The Sixth Amendment right to effective assistance of counsel includes the right to representation free from conflicts of interest. *Mickens v. Taylor*, 535 U.S. 162, 166 (2002); *Cuyler v. Sullivan*, 446 U.S. 335, 349-50 (1980). It is insufficient to show a mere "possibility of conflict." *Cuyler*, 446 U.S. at 351. Rather, to demonstrate a conflict of interest for Sixth Amendment purposes, a petitioner must show his counsel operated under an "actual conflict" that "adversely affect[ed] counsel's performance." *Mickens*, 535 U.S. at 172. Potentially divided allegiances do not constitute active representation of conflicting interests. *Paradis v. Arave*, 130 F.3d 385, 391 (9th Cir. 1997). Speculation will not substitute for evidence. *Morris v. California*, 966 F.2d 448, 456 (9th Cir. 1992). If a petitioner demonstrates counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance," prejudice to the petitioner is presumed. *Cuyler*, 446 U.S. at 350. In such cases, the defendant need not satisfy the "prejudice" prong of the *Strickland* analysis. *Id.*; *Strickland*, 466 U.S. at 692. The United States Supreme Court has limited application of the *Cuyler* standard and exception to cases involving multiple concurrent representation of defendants. *Mickens*, 535 U.S. at 174-175 (holding the language in *Cuyler* does not "clearly establish, or indeed even support" applying *Cuyler* beyond joint representation cases); *see also Earl v. Ornoski*, 431 F.3d 1158, 1185 (9th Cir. 2005) (recognizing for AEDPA purposes that "the Supreme Court . . . has expressly limited its constitutional conflicts jurisprudence" to joint representation

15

cases"). Any other conflict case must satisfy both prongs of the ineffective assistance of counsel standard in *Strickland*. *Id.*; *see also Bragg v. Galaza*, 242 F.3d 1082, 1086-90 (9th Cir. 2001).

The record establishes that West's counsel was not jointly representing any co-defendants. Accordingly, West must both show that his counsel otherwise had a conflict of interest and that such conflict prejudiced West's defense.

The record establishes the context for West's decision to represent himself and establishes that his counsel did not have a conflict of interest. As demonstrated through the present petition, from the outset of the state's prosecution West has argued and continues to argue that the search of his vehicle was improper. The issue was litigated, and decided adverse to West, in pre-trial motions prior to the first trial. Despite those rulings, during the first trial defense counsel pursued a defense theory that (a) the search of West's vehicle was improper, (b) the jury could decide whether the search was improper, and (c) if the jury so found, it must not consider the evidence seized during the search. Consistent with this defense theory, counsel requested and obtained two instructions. The first, Instruction 19, instructed the jury that if it concluded the vehicle was searched "pursuant to the 'search incident to arrest' exception to warrantless searches, the jury "must find that the search was improper" and disregard all evidence seized. The second, Instruction 20, instructed the jury that the voluntariness and scope of a consent to search are questions of fact, and that if the jury found "the search was improper" it must disregard all evidence seized. In response to the decision of the first trial court to give these instructions to the jury, the state requested and obtained Jury Instruction 22: that the court had already determined that the search of the vehicle was legal and constitutional. During jury deliberations, the jury requested clarification of Instruction 19 as it conflicted with Instruction 22 that court had determined the search was legal and constitutional.

Prior to the second trial, the state moved to preclude the defense from again pursuing its theory that the jury could decide the legality of the search of West's vehicle. The state argued that not only were the jury instructions in the first trial in conflict and caused the deadlocked jury but that the defense theory was contrary to well-established law. The state concluded that the legality of the search, and the admissibility of the evidence, were not only issues for the court to decide but those issues were decided by the court adverse to West prior to the first trial. West, through his counsel, opposed the motion. The second trial judge granted the motion in limine. As indicated by West's allegation that his counsel was going to alter the theory of defense to avoid the imposition of sanctions, counsel apparently conveyed to West that he would abide by the court's ruling. Counsel's decision to abide by a ruling of the court neither created a conflict of interest nor forced West to represent himself. Given that the record is contrary to West's vague allegations, he has not shown that the Nevada Appellate Court unreasonably determined that he had not supported his claim that counsel had a conflict of interest with sufficient facts to entitle him to relief. Accordingly, West's eleventh ground for relief is without merit.

Ground Twelve

In his twelfth ground, West argues he is entitled to relief because the cumulation of errors. The Nevada Supreme Court rejected this claim. That ruling was neither contrary to clearly established federal law nor an unreasonable determination of the facts presented in the record.

Therefore, for good cause shown,

THE COURT **ORDERS** that Hyrum West's Motion for Extension of Time (ECF No. 71) to file a reply to the respondent's answer is GRANTED; The Court has considered West's reply, filed at ECF No. 72, as timely filed and has considered the arguments raised in that reply in determining his petition for relief.

THE COURT FURTHER **ORDERS** that Hyrum West's Motion for Appointment of Counsel (ECF No. 73) is DENIED;

THE COURT FURTHER **ORDERS** that Hyrum West's Amended Petition Pursuant to 28 U.S.C. §2254 (ECF Nos. 33 & 34) is DENIED. The Clerk of the Court shall enter a judgment denying West's Amended Petition.

DATED this 23 day of January, 2020.

_____
Lloyd D. George
United States District Judge

18